**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Plaintiff

14 CV 2814



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER TOPPING, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br>                  Plaintiff, <br> vs. <br><br> DELOITTE TOUCHE TOHMATSU CPA LTD., and DELOITTE & TOUCHE LLP, <br><br>                  Defendants. | CASE No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Christopher Topping, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   **DEFENDANTS' MISCONDUCT**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased common stock of ChinaCast, Inc. ("CAST"), during the period between April 18, 2009 and April 19, 2012, inclusive.  Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      CAST is a Delaware company that was traded on the NASDAQ stock exchange, but whose operations take place entirely in China through its operating subsidiaries. It came to U.S. markets in September 2006 through a reverse merger, in which predecessor Great Wall Acquisition Corporation ("Great Wall"), a holding company with no operations, "acquired" ChinaCast Communication Holdings Limited ("CCT Holding"). In return, CCT Holding's shareholders obtained the majority of Great Wall's stock. Through its subsidiaries, CAST operates various post-secondary and e-Learning businesses in China.

3.      Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), a member of the global Deloitte network, was CAST's registered independent auditor between September 2006 and March 2013.[1] As CAST's auditor, DTTC conducted audits of each of CAST's financial statements from fiscal years 2003 to 2011. In each audit, DTTC stated that CAST's financial statements comported with Generally Accepted Accounting Principles ("GAAP") and that DTTC's audit complied with the applicable audit standards promulgated by the Public Company Accounting Oversight Board ("PCAOB Standards"):

We have audited the accompanying consolidated balance sheets of ChinaCast Education Corporation, its subsidiaries, and its variable interest entity (collectively, the "Company") as of December 31, [the fiscal year for the 10-K, along the previous year], and the related consolidated statements of operations and comprehensive income, changes in equity, and cash flows for each of

---

[1] DTTC was retained to audit CCT Holding in connection with the reverse merger.

the three years in the period ended December 31, [2007, 2008, 2009, or 2010], all expressed in Renminbi.  Our audits also included the financial statement schedule included in Schedule 1.  These financial statements and financial statement schedule are the responsibility of the Company's management.  Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).***  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, [the fiscal year for the 10-K, along the previous year], and the results of its operations and its cash flows for each of the three years in the period ended December 31, [the fiscal year for the 10-K], in conformity with accounting principles generally accepted in the United States of America.***  Also, in our opinion, such financial statement schedule, when considered in relation to the consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.
[Emphasis added].

    4.    The statements were included in the 10-Ks that CAST filed with the SEC, and were publicly available there:

| Filing | False financial statements for period | Filed with the SEC on |
|---|---|---|
| 2008 10-K | Fiscal years 2007 and 2008 | March 16, 2009 |
| 2009 10-K | Fiscal years 2008 and 2009 | March 29, 2010 |
| 2010 10-K | Fiscal years 2009 and 2010 | March 16, 2011 |

    5.    Deloitte & Touche LLP ("DT") is the U.S. arm of the global Deloitte network, and has ultimate authority over the conduct of the CAST audit, in that (a) DTTC cannot sign off on financial statements without DT's specific approval after a review of the financial statements, (b) DT made specific comments to CAST's financial statements which were forwarded to CAST and had to

be addressed before DTTC could approve the filings, (c) and DT specifically counseled CAST's audit committee on audit issues.

### a. Auditors' responsibilities

6.      An auditor is responsible for conducting audits in accordance with PCAOB Standards.

7.      PCAOB Standards include generally accepted accounting standards ("GAAS"), which are authoritative standards that auditors must comply with when they conduct audits and reviews. DTTC was required to perform its annual audits and quarterly reviews of financial information in accordance with GAAS, which include ten basic standards known as "Statements on Auditing Standards" that are codified and referred to as "AU." These include the following standards, all of which were knowingly or recklessly violated by DTTC:

> (a)      "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.2.

> (b)      "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 150.02.

> (c)      "Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence." AU § 230.07.

> (d)      "The auditor's assessment of the risks of material misstatement due to fraud should be ongoing throughout the audit. Conditions may be identified during

fieldwork that change or support a judgment regarding the assessment of the risks, such as . . . [d]iscrepancies in the accounting records, including . . . [u]nsupported or unauthorized balances or transactions." AU § 316.68.

(e)     "During the performance of confirmation procedures, the auditor should maintain control over the confirmation requests and responses. Maintaining control means establishing direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses." AU § 330.28.

(f)     "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21(c). Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU §333.02

(g)     "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements."

(h)     "[W]ithout adequate attention to the proprietary and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16.

8.      PCAOB standards also include GAAP, which are principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Pursuant to SEC Regulation S-X (17 C.F.R. and §210.4(a)(1)), financial statements filed with the SEC that are not prepared in compliance with

9.      DTTC knowingly or recklessly certified the Company's financial results and statements that were prepared in violation of GAAP and that misstated, inter alia, the Company's revenues, net income, cash balances, and term deposits

10.      DTTC violated the following GAAP principles, among others:

(a)      The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement Concepts No. 2, 58-59);

(b)      The principle that a company's financial statements must be reliable, transparent, truthful, and accurately reflect the financial performance of the company (FASB Statement Concepts No. 2);

(c)      The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 79);

(d)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 95, 97);

(e)      The principle that companies must accurately present the financial results of the corporation's operations, and to disclose net income as a reflection of all items of profit and loss recognized during the period (APB Opinion No. 9);

6

(f)     The principle that companies must accurately state the income received by the corporation in a reported period, according to standards for the reporting of comprehensive income and its components in a full set of general-purpose financial statements (FASB Statement No. 130); and

(g)     The principle that revenue recognized by a corporation in its financial statements must accurately reflect the business operations of the company. (FASB Statement of Concepts No. 5).

**b.   DTTC's statements that CAST's financial statements comported with GAAP and that its own audit comported with PCAOB Standards were false.**

11.     Throughout the Class Period, CAST's financial statements were riddled with fraudulent statements. Indeed, according to certain large investors who have sued DTTC and DT for their misconduct in connection with CAST, CAST engaged in rampant fraud under DTTC's nose, including:

(a)     In FY 2007-2010, CAST had pledged between 55 and 65 percent of its terms deposits, or between $50 million and $110 million, to secure loans extended to third parties:

| As of December 31 | Percentage of total term deposits pledged | Total amount pledged |
|---|---|---|
| 2007 | 62% | $81.7 million |
| 2008 | 58% | $54.3 million |
| 2009 | 55% | $74.6 million |
| 2010 | 65% | $106.7 million |

(b)     CAST claimed to own 98.5% of a key subsidiary ChinaCast Technology (HK) Limited ("CCT HK"), but that subsidiary was in fact 50% personally owned by CAST's CEO, with CAST a minority shareholder holding only 49.25% of CCT HK;

(c)     CAST repeatedly purportedly sold its stock to persons related to its CEO including a purported purchase of $29.3 million in shares on June 2, 2010 and a purported purchase of $5 million in shares on January 5, 2010, which was more than half of CAST's total 2010 cash from its operating activities. CAST issued the shares and never received payment, but the proceeds it should have received were reflected on its financial statements;

(d)     In December 2009, $35 million CAST obtained in an offering were immediately wired to entities outside of CAST, likely to entities controlled by CAST's CEO and his affiliates, but the $35 million was likewise reflected on CAST's financial statements;

(e)     Though CAST is an education company, its financial statements reflected huge payments to and from companies having nothing to do with its business, including almost $4.5 million in payments to a pawn shop in 2009 and another $15 million in payments in 2009 to various metal factories;

(f)     CAST purported to have purchased interests in universities in each of 2008, 2009, and 2010, for substantial sums -- $70 million to buy Hai Lai in 2008, $53 million to buy East Achieve in 2009, and $68 million in August 2010 to acquire Wintown. CAST claimed to have paid for the universities using its cash reserves, and in particular, CAST purported to have made transfers from one of its bank accounts

8

in August and September 2010 to pay for Wintown. And indeed DTTC reported to CAST that it had made the payments from that account. But CAST never did, and as to Wintown, the bank statement for the bank account from which CAST claimed to have paid for Wintown through payments in August and September 2010, as DTTC purported to confirm, shows that no such payments were made in August and September 2010. Instead, CAST obtained massive undisclosed loans secured by the universities themselves, and the universities were foreclosed on when CAST stopped making payments.

12.     As a result, according to the large investors, CAST's financial statements contained at least the following materially false statements:

(a)     CAST's cash flow statements for fiscal years 2009 and 2010 overstated cash flow from financing activities by at least, respectively, $35 million and $34.3 million;

(b)     CAST's balance sheet for fiscal year 2010 overstated cash and cash equivalents by at least $69.3 million;

(c)     CAST's financial statements claimed to own 98.5% of CCT HK, and consolidated CCT HK's financial statements into CAST's own in violation of GAAP;

(d)     CAST's 2008 financial statements did not reflect as liabilities the massive loans CAST had entered into to buy Hai Lai, CAST's 2009 financial statements did not reflect as liabilities the massive loans CAST had entered into to buy Hai Lai and

East Achieve, and CAST's 2010 financial statements did not reflect as liabilities the massive loans CAST had entered into to buy Hai Lai, East Achieve, and Wintown;

(e)     FASB Statement 140 requires that financial statements disclose assets pledged as collateral, either by creating a separate line item in the financial statements or by otherwise disclose all assets pledged as collateral. Though CAST had, at all relevant times, pledged most of its term deposits to secure the debts of third parties, CAST's financial statements for fiscal years 2007 through 2010 did not include this mandatory disclosure.

13.     Accordingly, DTTC's statements that CAST's financial statements comported with GAAP were false.

14.     Similarly, according to the large investors, DTTC engaged in at least the following additional misconduct which violated PCAOB Standards:

(a)     DTTC never reviewed the entirety of the CAST bank account statements it obtained, reviewing only the final page and discarding the remainder;

(b)     Though CAST only ever entered into a few significant transactions per year between 2007 and 2010, and though nearly all were sham transactions in which, if payment was due to CAST, cash was never provided to CAST by the purchaser or was immediately looted, or, if payment was due from CAST, CAST never provided payments to the seller from its own accounts.

15.     Because of the facts alleged in ¶¶ b-14, above, DTTC's statement that it had complied with PCAOB Standards in conducting its audit was false.

10

## II.  <u>LOSS CAUSATION</u>

16.    In early 2012, the Company's shares traded at a price well over $6.00 per share. As the truth emerged regarding the Company's financial condition and Defendants' fraud, the Company's stock price declined dramatically.

17.    On March 26, 2012, the Company announced that "Ron Chan Tze Ngon was removed from his position as Chief Executive Officer of the Company by the Company's board of directors."

18.    On March 30, 2012, trading in ChinaCast's stock was halted.

19.    On April 2, 2012, the Company's Board of Directors sent an open letter to shareholders, stating that "we have uncovered questionable activities and transactions" by Ron Chan and others. Trading in ChinaCast's stock was halted on the same day, with the stock closing at $4.24 per share.

20.    On April 17, 2012, the Company announced that effective April 11, "Jim Ma was removed from his position as Chief Accounting Officer of the Company by the Company's board of directors."

21.    On April 19, 2012, having already announced that "questionable activities" had been discovered, the Company detailed its findings up to that point, revealing to the investing public that the Company had been the subject of a financial fraud. The Company announced a series of specific issues it was continuing to investigate, including:

        (a)    The unauthorized transfer of subsidiaries holding interests in two of the Company's colleges, Lijiang College and Hubei International University Business College, to unauthorized persons outside of the Company group structure.

(b)      Possible undisclosed related party transactions involving the use of Company assets to establish and operate education-related companies outside of the Company's group structure;

(c)      Possible undisclosed loans to third parties secured by Company assets and without the board's knowledge.

22.      On May 14, 2012, the Company announced further investigations, including into the "withdrawal of over Rmb760 million (approximately US$120 million) in cash from the bank accounts of CCT Shanghai and YPSH from July 2011 through April 2012 without the prior knowledge of the Company's Board of Directors."

23.      In June and July 2012 filings, the Company further acknowledged that it suspected that two of its private colleges had been transferred, without authorization, to third parties.

24.      On June 25, 2012, trading in ChinaCast re-opened. As a result of the disclosures that were made during the time that trading was halted, the Company's stock price declined precipitously, closing $0.82 per share on June 25 from its previous pre-halt close of $4.24, or about 81%.

25.      On July 30, 2012, the Company provided more detail on its "findings to date" in connection with its previously announced internal investigation, including of the financial statements. Included in its detailed findings were that "certain subsidiaries of the Company pledged a total of approximately US$37 million in cash deposits on separate occasions to secure bank borrowings by unrelated parties." The Company also disclosed that it was involved in litigation in the PRC related to loan guarantees to "Wu Caiyu, an unidentified third party."

26.     On December 21, 2012, the Company provided further details of its investigation, and instructed investors to no longer rely on the Company's audited financials for 2009 and 2010. The Company stated that its internal investigation had uncovered the specifics of a number of problems. These included the following:

(a)      "*Non-bank borrowings*. Although the Company's investigation is still ongoing, based on the continuing investigation, it appears likely that other borrowings as of various dates from the fourth quarter of 2009 (and possibly earlier) to the third quarter of 2011 were understated in the Previously Issued Financial Statements. Specifically, management believes, based on recent discoveries, that from the fourth quarter of 2009 (and possibly earlier) until the second quarter of 2012, the Company under Prior Management had taken out a series of short-term, high interest rate loans from a number of family members, friends and related companies of Prior Management, as well as various unrelated companies, without the knowledge or consent of the Company. While the Company to date has only been able to obtain bank record and legal documentation evidence to corroborate some of these undisclosed borrowings, management believes, based on recent discoveries, that the total amount of such borrowings from the fourth quarter of 2009 to the fourth quarter of 2011 could be over Rmb900 million. Management has not been able to determine the number and amount of loans that remain outstanding, but claims against the Company have been filed by individuals for non-repayment of debts that were not disclosed in the Previously Issued Financial Statements."

(b)      "Interest in a purported majority-owned subsidiary. The Company has recently learned that records obtained from the Hong Kong Companies Registry reflect that ChinaCast Technology (HK) Limited ("CCT HK"), which according to the Previously Issued Financial Statements (and other public filings since 2007) is wholly-owned by Company subsidiary ChinaCast Technology (BVI) Limited ("CCT BVI"), is actually owned only as to 50% by CCT BVI, with Mr. Chan owning the remaining 50%. The Company continues to investigate how Mr. Chan came to hold this ownership stake without the Board's knowledge or consent. As the Company only owns approximately 98.4% of CCT BVI, the Company effectively holds only an approximately 49.2% indirect equity interest in CCT HK. As such, CCT HK should not have been consolidated as a majority-owned subsidiary in the Previously Issued Financial Statements."

(c)      "December 2009 stock offering proceeds. The Company has now discovered that Prior Management had transferred a substantial portion (at least US$35 million) of the US$44 million proceeds (net of underwriting discount) from the Company's December 2009 public common stock offering to entities outside of the Company's group structure without the knowledge or consent of the Board. These cash outflows, made shortly after the offering's completion, have not been disclosed in any of the Previously Issued Financial Statements. "

(d)      "2009 year-end term deposits. The Company has recently learned that at least Rmb250 million (US$36 million) of the Rmb507 million (US$75 million) amount that was classified as term deposits on the Company's balance sheet as of

December 31, 2009, was actually pledged by Prior Management to guarantee the debts of various third parties – many of whom appear to operate outside of the Company's scope of business – as of that date. The pledges, which were entered into without the knowledge or approval of the Board, (i) appear to fall outside of the Company's scope of business and (ii) had effectively reduced the amount of cash available to the Company. Adjusting for these pledges, cash available from term deposits as of December 31, 2009, would have been reduced from Rmb507 million (US$75mmillion) to an amount of Rmb257 million (US$38 million) or less."

(e)      "January 2010 stock issuance proceeds. In connection with its ongoing investigation, management has been unable to confirm from statements for the Company's known bank accounts that it had received the US$5 million that, according to the previously issued financial statements, Thriving Blue Limited had paid on January 4, 2010, to purchase 692,520 shares of the Company's common stock. According to the Previously Issued Financial Statements, Thriving Blue Limited is a British Virgin Islands company that is 100% owned by Mr. Chan, which had purchased the 692,250 shares on behalf of Mr. Chan, Mr. Sena and the Company's then president-International Michael Santos."

(f)      "June 2010 stock issuance proceeds. In connection with its ongoing investigation, management has been unable to confirm from statements for the Company's known bank accounts that the Company had received any of the $29 million that, according to the Previously Issued Financial Statements, the Company had received for the sale of 3,735,734 shares of common stock to nominees of Mr.

Wu Shixin in June 2010. The Company is continuing to investigate the purpose for this stock issuance to nominees of Mr. Wu."

(g)      "August 2010 college acquisition. In connection with the Company's ongoing investigation, the Company has learned that the amount that the Company had paid for its acquisition of Hubei International University Business College ("HIUBC") was overstated and the manner of the acquisition was inaccurately described in the Previously Issued Financial Statements."

(h)      "2010 year-end cash and cash equivalents and term deposits. The Company has now uncovered through its ongoing investigation that cash and cash equivalents as of December 31, 2010, which according to the Previously Issued Financial Statements was Rmb244 million (US$37 million), was overstated by at least Rmb50 million (US$8 million) as of that date."

(i)      "The Company has recently discovered that at least Rmb600 million (US$91 million) of the Rmb704 million (US$107 million) amount that was classified as term deposits on the Company's balance sheet as of December 31, 2010, was actually pledged to guarantee the debts of various third parties – many of whom appear to operate outside of the Company's scope of business – as of that date. The pledges, which were entered into without the prior knowledge or approval of the Board, (i) appear to fall outside of the Company's scope of business and (ii) had effectively reduced the amount of cash available to the Company. Adjusting for these pledges, cash available from term deposits as of December 31, 2010, would have been

reduced from Rmb704 million (US$107 million) to an amount of Rmb104 million (US$16 million) or less."

(j)      "Taking into account the overstatements in term deposits and cash and cash equivalents described above, the aggregate cash, cash equivalents and term deposits as of December 31, 2010, would have been reduced to Rmb298 million (US$45 million) from the Rmb948 million (US$144 million) reported in the Previously Issued Financial Statements."

(k)      "Term deposits. As noted above, a significant portion of the Company's term deposits as of December 31, 2009, December 31, 2010, June 30, 2011, and September 30, 2011, was pledged to guarantee the debts of various third parties (many of which appear to operate outside of the Company's scope of business) as of such dates. To date, the Company has discovered that Prior Management had over the years entered into at least 40 such previously undisclosed account pledges, involving an aggregate Rmb1,513 million (US$243 million) of the Company's term deposits, without the Company's knowledge or consent. The Company is continuing to investigate this pledging of term deposits for the benefit of third parties without the Board's knowledge or consent."

(l)      "October 2009 college acquisition. Management is investigating whether the amount that the Company had paid for its acquisition of Lijiang College in October 2009 was overstated and whether the manner of the acquisition was accurately described in the Previously Issued Financial Statements."

17

(m)    "CCLX revenues. Management is investigating whether any of the revenues for its ELG segment in 2009, 2010 and the first nine months of 2011 have been overstated. To date, management has discovered that Rmb 96 million of the Rmb208 million of CCLX's revenues for 2010 reported in the Previously Issued Financial Statements was purportedly invoiced in December of that year, while a significant portion of the revenues that CCLX had reported to tax authorities in China for 2011 was purportedly invoiced in December of that year as well. In connection with the ongoing investigation, management has also had discussions with former CCLX employees and obtained financial data from such staff that management now believes may raise questions above the veracity of CCLX's historical financial information, as presented in the Previously Issued Financial Statements."

### III.    **JURISDICTION AND VENUE**

27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

28.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

29.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). In addition, venue is proper because Defendant DT resides in this Judicial District.

30.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

18

including but not limited to, the United States mails, interstate telephone communications and the facilities of the NASDAQ ("NASDAQ").

## IV.   **PARTIES**

31.     Plaintiff Christopher Topping, as set forth in the attached PSLRA certification, purchased CAST securities at artificially inflated prices during the Class Period and has been damaged thereby.

32.     Defendant DTTC is an auditing firm located in the People's Republic of China ("PRC" or "China") with headquarters at 30/F Bund Center, 222 Yan An Road East, Shanghai, China. DTTC is registered with the PCAOB.

33.     Defendant DT is a Delaware limited liability partnership located at 1633 Broadway, New York, New York.

## V.   **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

34.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock of CAST during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by CAST or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of CAST; and
>
> (c) to what extent the members of the Class have sustained damages, and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

20

individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Applicability of Presumption of Reliance:**
**<u>Fraud-on-the-Market Doctrine</u>**

40.     At all relevant times, the market for CAST common stock was an efficient market for the following reasons, among others:

> (a)     The Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

> (b)     During the class period, on average, over several hundreds of thousands of shares of CAST stock were traded on a weekly basis, demonstrating a very active and broad market for the  Company's stock and permitting a very strong presumption of an efficient market;

> (c)     CAST regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press  releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press  and other similar reporting services;

> (d)     CAST was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

> (e)     Numerous FINRA member firms were active market-makers in CAST stock at all times during the Class Period; and

(f)     Unexpected material news about CAST was rapidly reflected and incorporated into the Company's stock price during the Class Period.

41.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding CAST from all publicly available sources and reflected such information in CAST's stock price.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of CAST's common stock at artificially inflated prices, and a presumption of reliance applies.

## VI.     <u>NO SAFE HARBOR</u>

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many or all of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## VII.   FIRST CLAIM

**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Promulgated Thereunder Against DTTC**

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, DTTC carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase CAST's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, DTTC took the actions set forth herein.

45.     DTTC (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CAST's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.     DTTC, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CAST as specified herein.

23

47.     DTTC employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CAST's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CAST and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CAST's securities during the Class Period.

48.     DTTC had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   DTTC's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CAST's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by DTTC's overstatements and misstatements of the Company's financial condition throughout the Class Period and of its own audit, DTTC, if it did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

49.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CAST's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of CAST's

24

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by DTTC, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by DTTC, but not disclosed in public statements by DTTC during the Class Period, Plaintiff and the other members of the Class acquired CAST common stock during the Class Period at artificially high prices, and were, or will be, damaged thereby.

50.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding CAST's financial results, which was not disclosed by DTTC, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CAST securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

51.     By virtue of the foregoing, DTTC has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

52.     As a direct and proximate result of DTTC's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

53.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## VIII.     SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against DT

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     DT acted as a controlling person of CAST within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its agency, ownership and contractual rights, and participation in and/or awareness of DTTC's operations and/or intimate knowledge of the false financial statements filed CAST with the SEC and disseminated to the investing public, DT had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of DT, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The DTTC was provided with or had unlimited access to copies of the DT's reports alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

56.     In particular, DT had direct and supervisory involvement in the day-to-day operations of DTTC, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, DTTC violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

58.     By virtue of its positions as a controlling person, DT is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of DT's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

59. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: April 18, 2014                              Respectfully submitted,

                                                   **THE ROSEN LAW FIRM, P.A.**


                                                   By:_____
                                                   Jonathan Horne, Esq. (JH 7258)
                                                   Laurence M. Rosen, Esq. (LR 5733)
                                                   Phillip Kim, Esq. (PK 9384)
                                                   275 Madison Avenue, 34th Floor
                                                   New York, NY  10016
                                                   Phone: (212) 686-1060
                                                   Fax: (212) 202-3827

                                                   *Attorneys for Plaintiff*