UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPER TOPPING, Individually and On
Behalf of All Others Similarly Situated,

                              Plaintiff,

        – against –

DELOITTE TOUCHE TOHMATSU CPA, LTD.
and DELOITTE & TOUCHE LLP,

                              Defendants.

---

**OPINION AND ORDER**
14 Civ. 2814 (ER)

Ramos, D.J.:

        This case, one of two related actions before this Court,[1] arises from allegations of an

independent auditor's failure to detect fraud at ChinaCast Education Corporation, Inc.

("ChinaCast" or the "Company"), an educational services company in the People's Republic of

China ("PRC"), whose stock was traded on the NASDAQ for several years.  Compl. (Doc. 2)

¶¶ 2-3, 44-50, 55-58.  In 2012, the Company disclosed that certain of its employees, led by its

former Chairman and CEO, Ron Chan Tze Ngon ("Chan"), had engaged in wide-ranging

fraudulent activities, including, *inter alia*, misappropriating ChinaCast's assets, misrepresenting

its ownership interests, and making substantial undisclosed loans to cover the debts of third

parties lacking any legitimate business relationship to the Company.  *Id.* ¶¶ 19-23.  After a series

of public announcements revealing the fraud, ChinaCast's stock price plummeted.  *Id.* ¶ 24.

        In this action, Christopher Topping ("Topping") brings suit against ChinaCast's

Shanghai-based independent auditor, Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), and its

---

[1] The other is *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 13 Civ. 1094 (ER).  In
that case, a group of investment funds, entities, and individuals who purchased ChinaCast stock bring suit against
Deloitte Touche Tohmatsu CPA, Ltd., Deloitte & Touche L.L.P., and individuals associated with the Company.

U.S. affiliate, Deloitte & Touche LLP ("Deloitte U.S." and, collectively, "Defendants"), on behalf of a class of persons who purchased or otherwise acquired shares of ChinaCast common stock between April 18, 2009 and April 19, 2012 (the "Class Period") and sustained losses in connection with their respective purchases and sales. *Id.* ¶¶ 1, 3, 5. The Complaint alleges that Defendants violated provisions of the Securities Exchange Act of 1934 (the "Exchange Act") by issuing and approving false statements in ChinaCast's public filings with the U.S. Securities and Exchange Commission ("SEC"). *Id.* ¶¶ 11-15. Topping asserts causes of action against DTTC for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against Deloitte U.S. for violations of Section 20(a) of the Exchange Act. *Id.* ¶¶ 43-59.

Before the Court are three competing motions for the appointment of lead plaintiffs and lead counsel, filed by Jayhawk Private Equity Fund II, LP ("Jayhawk"), Ronald D. Ordway ("Ordway"), and Christopher Hong ("Hong").[2] For the reasons set forth below, Ordway's motion for appointment as lead plaintiff and for appointment of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as lead counsel is hereby GRANTED. Accordingly, the motions filed by Jayhawk and Hong are hereby DENIED.

## I.     Background

ChinaCast is a Delaware company whose operations take place entirely through its subsidiaries, which operate various post-secondary and e-Learning businesses in the PRC. *Id.* ¶ 2. DTTC was ChinaCast's registered independent auditor between September 2006 and March

---

[2] Jayhawk labels its motion "Motion of Jayhawk Private Equity Fund II, LP for Consolidation of Related Actions, Appointment as Lead Plaintiff and Approval of Co-Lead Counsel." Doc. 5. Hong also requests that the Court "consolidate the related actions," and describes all three of the instant motions as "motions for consolidation and appointment as Lead Plaintiff and Lead Counsel." Hong's Mem. in Resp. to Competing Mot. (Doc. 17) at 1, 7. Presumably, the parties seek consolidation with the aforementioned related case before this Court, *Special Situations Fund III*, 13 Civ. 1094 (ER), to which the Rosen Law Firm marked this case as related on April 18, 2014. Doc. 3. However, no party analyzes the issue of consolidation in their submissions or identifies the specific cases to be consolidated. Accordingly, the Court addresses only the parties' motions to appoint lead plaintiff and lead counsel.

2013 and conducted audits of each of ChinaCast's financial statements from fiscal years 2003 to 2011. *Id.* ¶ 3. In each audit, DTTC stated that ChinaCast's financial statements comported with Generally Accepted Accounting Principles ("GAAP") and that its own audit complied with the applicable standards promulgated by the United States Public Company Accounting Oversight Board ("PCAOB Standards"). *Id.* These statements were included in the Forms 10-K that ChinaCast filed with the SEC. *Id.* ¶¶ 3-4. The Complaint further alleges that Deloitte U.S., as the U.S. operator of the "global Deloitte network," had ultimate authority over DTTC's conduct during the ChinaCast audits. *Id.* ¶¶ 5, 54-59.

The original Complaint, filed on April 18, 2014, describes how the fraudulent activity at ChinaCast was revealed through a series of public disclosures beginning in the spring of 2012:

- On March 26, 2012, ChinaCast announced that CEO Chan had been removed from his position by the Board of Directors ("Board"). *Id.* ¶ 17.

- On April 2, 2012, the Board sent an open letter to shareholders indicating that they had "uncovered questionable activities and transactions" by Chan and others. *Id.* ¶ 19.

- On April 17, 2012, the Company announced that, effective April 11, the Company's Chief Accounting Officer ("CAO"), Jim Ma, had also been removed. *Id.* ¶ 20.

- On April 19, 2012, ChinaCast revealed that the Company had been the "subject of a financial fraud" and outlined a series of issues that it was continuing to investigate, including: "the unauthorized transfer of subsidiary holding interests in two [colleges owned by ChinaCast] . . . to unauthorized persons outside of the Company group structure," "[p]ossible undisclosed related party transactions involving the use of Company assets," and "[p]ossible undisclosed loans to third parties secured by Company assets and without the [B]oard's knowledge." *Id.* ¶ 21.

- On May 14, 2012, ChinaCast announced additional investigations into issues including the "withdrawal of over Rmb760 million (approximately US$120 million) in cash from the bank accounts of [subsidiaries] CCT Shanghai and YPSH from July 2011 through April 2012 without the prior knowledge of the . . . Board." *Id.* ¶ 22.

- In filings issued in June and July 2012, ChinaCast stated that "it suspected that two of its private colleges had been transferred, without authorization, to third parties." *Id.* ¶ 23.

- On July 30, 2012, the Company disclosed that certain ChinaCast subsidiaries had pledged "a total of US$37 million in cash deposits on separate occasions to secure bank

borrowings by unrelated parties" and that the Company was "involved in litigation in the PRC related to loan guarantees to 'Wu Caiyu, an unidentified third party.'" *Id.* ¶ 25.

- On December 21, 2012, ChinaCast revealed its discovery of problems in its previously issued audited financial statements and of numerous demonstrations of fraudulent activities and misrepresentations by ChinaCast leadership and employees beginning in 2009. *Id.* ¶¶ 26(a)-(m).

Trading in ChinaCast's stock was halted on Monday, April 2, 2012 and did not reopen until June 25, 2012.[3]  *Id.* ¶¶ 19, 24.  ChinaCast's stock price dropped dramatically after the 2012 disclosures:  In early 2012, the stock traded at a price well over $6.00 per share; on April 2, 2012, its halt price was $4.24; and when trading resumed on June 25, 2012, the stock closed at a price of $0.82 per share.  *Id.* ¶¶ 16, 19, 24.

Topping filed this action on April 18, 2014.  *Id.* at 27.  That same day, the Rosen Law Firm, P.A. (the "Rosen Law Firm") published a notice on *GlobeNewswire* (the "Class Action Notice"),[4] which advised that Topping, via counsel at the firm, had filed a securities class action on behalf of ChinaCast investors, and that purchasers of ChinaCast could move for appointment as lead plaintiff until June 17, 2014, the close of the 60-day window provided for by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Jayhawk's Mem. L. (Doc. 6), Ex. 1.   On June 17, 2014, Jayhawk filed its motion for appointment as lead plaintiff, approval of the Rosen Law Firm as lead counsel, and approval of Pomerantz LLP as co-lead counsel.  Jayhawk's Mot. (Doc. 5).  Jayhawk is a "sophisticated" institutional investor based in Mission, Kansas, with offices throughout the United States and in Hong Kong.  Doc. 6 at 6.  On the same day, two individual investors who purchased ChinaCast stock during the Class Period—Ronald Ordway

---

[3] The Complaint alleges that trading in ChinaCast's stock was halted on both March 30, 2012 and April 2, 2012. Compl. ¶¶ 18-19.

[4] Such notice is required by Section 21D(a)(3)(A)(i) of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

and Christopher Hong—each filed competing motions seeking their own appointment as lead plaintiffs and appointment of their attorneys as lead counsel. Ordway's Mot. (Doc. 7); Hong's Mot. (Doc. 9). Ordway is represented by Cohen Milstein, and Hong is represented by Scott+Scott, Attorneys at Law, LLP ("Scott+Scott") and Andrews & Springer LLC ("Andrews & Springer"). Doc. 7 at 1; Doc. 9 at 1.

Jayhawk's Chief Financial Officer, Michael Schmitz, has submitted a certification attesting that he is "willing to serve as a lead plaintiff either individually or as part of a group . . . on behalf of other class members in directing the action," including by "testifying at deposition and trial." Doc. 6, Ex. 2. Ordway and Hong have also individually submitted certifications attesting that they are willing to represent the class, including by testifying at deposition and trial. Bunch Decl. (Doc. 10),[5] Ex. B; Guglielmo Decl. (Doc. 12),[6] Ex. 2. Additionally, all three movants point to the extensive experience, knowledge, and skills of each of their respective attorneys as support for each firm's designation as lead counsel. Doc. 6 at 8; Ordway's Mem. L. (Doc. 8) at 8; Hong's Mem. L. (Doc. 11) at 6-7.

Of vital importance to the Court's resolution of the instant motions, each movant purports to have suffered financial loss as a result of the ChinaCast fraud. Jayhawk alleges that, between March 15 and August 29, 2011, it purchased a total of 914,997 ChinaCast shares for $4,788,597.42. Doc. 6, Ex. 3. Jayhawk sold 814,997 of these between March 22 and October 21, 2011, and sold the remaining 100,000 shares on October 27, 2011. *Id.* In aggregate, Jayhawk netted $3,078,783.72 from its sales of ChinaCast stock, reflecting a total loss of

---

[5] Citations to "Bunch Decl." refer to the Declaration of S. Douglas Bunch in Support of the Motion of Ronald D. Ordway for Appointment as Lead Plaintiff and Appointment of Lead Counsel, dated June 17, 2014.

[6] Citations to "Guglielmo Decl." refer to the Declaration of Joseph P. Guglielmo in Support of the Motion of Christopher Hong for Appointment as Lead Plaintiff and Appointment of Co-Lead Counsel, dated June 17, 2014.

$1,709,813.71. *Id.* However, as discussed below, Jayhawk did not purchase, sell, or hold any shares of ChinaCast stock between October 27, 2011 and April 19, 2012, the end of the Class Period. *Id.* Ordway, meanwhile, alleges that, during the Class Period, he purchased a total of 41,000 ChinaCast shares at a cost of $249,820.17 and sold 1,000 shares for $4,325.55. Doc. 10, Ex. C. At the end of the Class Period, Ordway retained 40,000 shares at a total value of $20,852.00, reflecting a total loss of $224,642.62.[7] *Id.* Finally, Hong alleges that, during the Class Period, he purchased 39,277 ChinaCast shares for $254,298.39 and sold 10,800 shares for $156.552.70. Doc. 12, Ex. 3. At the end of the Class Period, he retained 28,477 shares, yielding a total loss of $97,745.69, or an $88,017.36 loss as calculated based on a "look back price" of $3.24. *Id.*[8]

After each of the three instant motions were filed but before the filing of opposition and reply briefs, on July 3, 2014, Topping, via the Rosen Law Firm, without seeking leave from the Court, filed a "Notice of Errata to Complaint" and a "Corrected Complaint." Doc. 14. The Notice states, "Due to an inadvertent scrivener's error, certain loss causation allegations were omitted from the Complaint. As such, Plaintiff files this Notice of Errata and accompanying [Corrected] Complaint containing the corrections located in paragraph 16-18 of the [Corrected] Complaint." Doc. 14 at 1 (bracketed words in original). Paragraphs 16-18, the sole additions to the Complaint as originally filed, state in their entirety:

---

[7] Ordway calculated this loss figure by subtracting the proceeds of his Class Period sales and the value of the shares he retained from the total cost of his Class Period purchases. Doc. 10, Ex. C. He calculated the value of his retained shares by multiplying each share by the look-back price of $0.52, the value of the share when trading resumed on June 25, 2012. *Id.* Calculating Ordway's loss using a look-back price of $3.24, the average price of the security in the 90 days after the end of the Class Period, it would amount to $115,895.17. Doc. 17 at 2.

[8] Hong calculated this loss figure using a look-back price of $3.24. Doc. 12, Ex. 3. He notes that his loss would amount to $165,397.10 using a look-back price of $0.52. Doc. 17 at 6. Hong also observes that Ordway has the largest financial interest as calculated under either look-back price, $0.52 or $3.24.

16.  The truth of Defendants' misstatements materialized and/or entered the market through partial corrective disclosures.

17.  On October 3, 2011, the Company issued a letter to its shareholders "providing an update on its stock buyback program and recent Board governance decisions."  Specifically, the Company disclosed that it was suspending its planned $50 million share buyback program and **that it would hire an independent auditing firm to review its cash balances.**

18.  On this news, the Company's stock fell $1.11 per share or 30%, to close at $2.58 per share on October 3, 2011.

Corrected Compl. ¶¶ 16-18 (Doc. 14, Ex. 1) (emphasis in original).

The practical effect of these three short paragraphs is decisive:  They provide Jayhawk with a basis, otherwise absent, for attributing its losses to the ChinaCast fraud.   In their opposition and reply papers, both Ordway and Hong assert that the "Corrected Complaint" is improper and should not be recognized by this Court.  *See* Ordway's Mem. L. Further Supp. (Doc. 19) at 5-9; Hong's Reply Mem. (Doc. 27) at 1-3; Ordway's Reply Mem. (Doc. 28) at 3-5.

## II.    Discussion

Under the PSLRA, the Court is required to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." 15 U.S.C. § 78u-4(a)(3)(B)(i).  In enacting the PSLRA, Congress sought to "prevent 'lawyer-driven' litigation, and to ensure that 'parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel.'"  *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (quoting *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998)).  The PSLRA directs the Court to adopt a rebuttable presumption that the most adequate plaintiff is "the person or group of persons" that:  (1) "has either filed the complaint or made a motion in response to a notice," (2) "in the determination of the court, has the largest financial interest in the relief

sought by the class," and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  This presumption may be rebutted only "upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff . . . will not fairly and adequately protect the interests of the class; or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 74u-4(a)(3)(B)(iii)(II).  *See Goldberger v. PXRE Grp., Ltd.*, No. 06 Civ. 3410 (KMK), 2007 WL 980417, at *3-4 (S.D.N.Y. Mar. 30, 2007) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).

### A.  Appointment of Lead Plaintiff

#### i.   Filed Complaint or Motion

Here, it is undisputed that all three movants satisfy the first requirement for the rebuttable presumption, as each filed motions pursuant to the Rosen Law Firm's Class Action Notice.  Doc. 6 at 3; Doc. 8 at 4; Doc. 11 at 3.

#### ii.  Largest Financial Interest

The second element of the rebuttable presumption—the question of which plaintiff has the greatest financial stake—"is the pivotal factor under the PSLRA."  *Reimer v. Ambac Fin. Grp., Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *2 (S.D.N.Y. May 9, 2008). Nevertheless, the PSLRA does not specify a formula for calculating which plaintiff has the "largest financial interest," and neither the Supreme Court nor the Second Circuit has provided instruction on the appropriate method.  *See Beckman v. Ener1, Inc.*, No. 11 Civ. 5794 (PAC), 2012 WL 512651, at *2 (S.D.N.Y. Feb. 15, 2012); *In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2008 WL 2811358, at *5 (S.D.N.Y. July 8, 2008).  Courts within this Circuit have adopted a four-factor test first promulgated in *Lax v. First Merck Acceptance Corp. v. Kahn*, No.

8

97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997), and adopted in *In re Olsten*, 3 F.

Supp. 2d 286, 295 (E.D.N.Y. 1998) (the "*Lax/Olsten* factors") to determine which party has the

largest financial interest. *See, e.g.*, *In re KIT Digital, Inc. Sec. Litig.*, 293 F.R.D. 441, 445

(S.D.N.Y. 2013); *Beckman*, 2012 WL 512651, at *2-3; *Orion*, 2008 WL 2811358, at *5;

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 394-95 (S.D.N.Y.

2008); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 234 (E.D.N.Y. 2011).  The four

*Lax/Olsten* factors are:

> (1) the total number of shares purchased during the class period;

> (2) the net shares purchased during the class period (in other words, the difference
> between the number of shares purchased and the number of shares sold during
> the class period);

> (3) the net funds expended during the class period, which represents the
> difference between the amount spent to purchase shares and the amount
> received for the sale of shares during the class period; and

> (4) the approximate losses suffered.

*See KIT Digital*, 293 F.R.D. at 445.  The fourth factor—financial loss—is viewed as the most

important.  *Id.*; *see also Reimer*, 2008 WL 2073931, at *3; *Simmons v. Spencer*, No. 13 Civ.

8216 (RWS), 2014 WL 1678987, at *4 (S.D.N.Y. Apr. 25, 2014); *In re Fuwei Films Sec. Litig.*,

247 F.R.D. 432, 437 (S.D.N.Y. 2008).

Both Jayhawk and Ordway claim to have the greatest financial interest in this litigation.[9]

Applying the *Lax/Olsen* factors to the allegations in the Complaint as originally filed, however,

Ordway's financial interest outweighs Jayhawk's, because Jayhawk has *no* financial interest.

During the Class Period, Jayhawk purchased 914,997 shares of ChinaCast stock, Doc. 6, Ex. 3,

---

[9] Hong makes no such representation, conceding that Ordway's financial interest surpasses his own, agreeing that Ordway is entitled to the PSLRA's most adequate plaintiff presumption, and echoing Ordway's assertion that Jayhawk cannot establish any losses attributable to the ChinaCast fraud.  Doc. 17 at 6-7.  Therefore, the Court examines only whether Ordway or Jayhawk is best suited to serve as lead plaintiff.

and Ordway purchased 41,000 shares.  Doc. 10, Ex. C.  Since Jayhawk sold all of the shares it

purchased during the Class Period, for the purposes of *Lax/Olsen*'s second factor Jayhawk's net

purchases were zero.  *See KIT Digital*, 293 F.R.D. at 445; Doc. 6, Ex. 3.  By comparison,

Ordway had 40,000 net shares at the end of the Class Period.  Doc. 10, Ex. C.  Jayhawk

expended net funds of $1,709,813.70 during the Class Period, Doc. 6, Ex. 3, while Ordway

expended net funds of $245,494.62.

At first glance, Jayhawk would appear to prevail by a wide margin under the fourth, and

most important, factor, alleging a $1,709,813.70 loss as a result of the ChinaCast Fraud, Doc. 6,

Ex. 3, compared with Ordway's allegation of a $224,642.62 total loss.  Doc. 10, Ex. C.[10]

However, both Ordway and Hong contend that because Jayhawk was a complete "in-and-out

trader"—"buying and selling into and out of the securities at issue during the class period"—and

sold all its shared before the initial March 26, 2012 disclosure, it suffered *no* actual losses

attributable to the ChinaCast's fraud and has no financial interest in this litigation.  *IBEW Local*

*90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 5815472, at *19

(S.D.N.Y. Oct. 29, 2013); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29,

37-40 (2d Cir. 2009); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec.*

*Act (ERISA) Litig.*, 281 F.R.D. 134, 148 (S.D.N.Y. 2012).

### a.  Loss Causation

In a securities class action, plaintiffs cannot prevail merely by alleging loss; rather, they

must demonstrate "loss causation," a "causal link between the alleged misconduct and the

---

[10] It is also worth noting that Jayhawk's argument for its appointment as lead plaintiff is buttressed by its status as an institutional investor.  "[M]any courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs" in securities exchange class actions.  *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012); *see also* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 733 ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396

F.3d 161, 172 (2d Cir. 2005) (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,

343 F.39 189, 197 (2d Cir. 2003)).  To plead loss causation, a plaintiff must allege either

(1) "direct causation," a sufficiently direct relationship between the investment loss and the

information misstated; (2) "materialization of risk," loss caused by the materialization of the

concealed risk; or (3) a "corrective disclosure," false information revealed by a disclosure event.

*Lentell*, 396 F.3d at 173-75; *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289

(S.D.N.Y. 2008); *see also In re Converse Tech., Inc. Sec. Litig.*, No. 06 Civ. 1825 (NGG)

(RER), 2007 WL 680779, at *4 (E.D.N.Y. Mar. 2, 2007), *adhered to on reconsideration*, 2008

WL 820015 (E.D.N.Y. Mar. 25, 2008) ("[P]laintiffs can recover in fraud-on-the-market cases

only if a specific loss was proximately caused by a defendant's misrepresentations.") (citing

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344-47 (2005)).  Moreover, "an inflated purchase

price will not itself constitute or proximately cause the relevant economic loss." *Dura*, 544 U.S.

at 342; *see also Flag*, 574 F.3d at 36 (observing that the Supreme Court's holding in *Dura*

"requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances,

changed investor expectations, new industry-specific or firm-specific facts, conditions, or other

events,' from disclosures of the truth behind the alleged misstatements").

      When selecting a lead plaintiff, courts must consider only those losses that will actually

be *recoverable* in the class action.  *See Converse*, 2007 WL 680779, at *4.  Where, as here,

plaintiffs endeavor to establish loss causation based on a corrective disclosure, losses that "may

have incurred before [a company's] misconduct was ever disclosed to the public are not

recoverable, because those losses cannot be proximately linked to the misconduct at issue in . . .

[the] litigation." *Id.*; *see also Porzio v. Overseas Shipholding Grp.*, No. 12 Civ. 7948 (SAS),

2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013) (explaining that, in the case of an in-and-out trader that sold its stock before a corrective disclosure, "there [was] a strong likelihood that their entire claimed losses [would] be unrecoverable . . . under the theory of fraud set forth in the . . . complaints, which is based entirely on [certain] disclosures"); *Bensley*, 277 F.R.D. at 237 ("In proving loss causation, a party typically identifies a disclosure of the fraud that causes a drop in the price of the stock. If, however, 'the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.'") (citing *Dura*, 544 U.S. at 342).

Therefore, when calculating movants' financial interests on a lead plaintiff motion, courts should not include "losses result[ing] from 'in-and-out' transactions, which took place during the class period, but before the misconduct identified in the complaint was ever revealed to the public." *Comverse*, 2007 WL 680779, at *4; *see also Flag*, 574 F.3d at 40 ("The standards laid out in *Dura* and *Lentell* are relevant to the in-and-out traders because in order to prove loss causation, any plaintiff who sold their stock prior to the . . . disclosure must prove that the loss they suffered was both foreseeable and caused by the 'materialization of the concealed risk.'"); *Porzio*, 2013 WL 407678, at *3 (denying in-and-out trader's lead plaintiff motion based on its likely inability to establish loss causation); *Bensley*, 277 F.R.D. at 237-41 (same). Because Jayhawk did not own any shares of ChinaCast stock during or after the initial March 26, 2012 disclosure alleged in the original Complaint,[11] Ordway and Hong maintain that, for the purposes of the "greatest financial interest" calculation, Jayhawk suffered *no* losses attributable to the ChinaCast fraud. Hong's Mem. in Resp. to Competing Mot. (Doc. 17) at 4. The Court agrees.

---

[11] As stated above, on March 26, ChinaCast's Board announced that they would be removing Chan. Compl. ¶ 17.

### b.  Corrected Complaint and Alleged Partial Disclosure

Jayhawk, however, maintains that it is an appropriate lead plaintiff despite selling *all* of

its ChinaCast shares prior to the 2012 disclosures because of a partial disclosure that took place

on October 3, 2011.  Jayhawk's Corr. Reply (Doc. 26) at 4-5 ("Jayhawk sold its shares **after** the

October 3, 2011 partial disclosure and, based on the allegations of all the complaints on file, 'can

allege that the subject of the fraudulent statement or omissions was the cause of the actual loss

suffered, and therefore, satisfy the test[] articulated by the Supreme Court in *Dura*.") (citation

omitted) (emphasis in original).  This argument fails for two reasons:  First, the Court may not

consider the alleged partial disclosure, because it was introduced only via an improperly filed

"Corrected Complaint."  Second, even if the Court considered the Corrected Complaint, the

October 3, 2011 announcement by ChinaCast would not amount to a "partial corrective

disclosure," and Jayhawk still would be unable to establish loss causation.

Jayhawk's initial hurdle to the success of this argument is the fact that the ostensible

partial disclosure was *not* included in the original Complaint and was added only when the

Rosen Law Firm—counsel to both Topping and Jayhawk—filed its "Notice of Errata and

Corrected Complaint."  Doc. 14.  Under the PSLRA, any purported class member may move to

serve as lead plaintiff "not later than 60 days after the date on which the notice [advising

purported class members of the pendency of the action] is published."  15 U.S.C.A. § 78u-

4(a)(3)(II); *see also Skwortz v. Crayfish Co., Ltd.*, No. 00 Civ. 6766 (DAB), 2001 WL 1160745,

at *5 (S.D.N.Y. Sept. 28, 2001).  The Rosen Law Firm, on behalf of Topping, filed such notice

on April 18, 2014.  Doc. 6, Ex. 1.  The "window for filing motions for appointment of lead

plaintiff, therefore, closed" on or about June 17, 2014, the date on which Jayhawk, Ordway, and

Hong filed their motions.  *See In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999).  The Corrected Complaint followed on July 3, 2014.

Based on this Court's nonexhaustive research, it appears that no court in the Second Circuit has examined the precise issue presented here:  whether, on considering a motion to appoint a lead plaintiff, courts may look to allegations contained in a "corrected" or amended complaint filed *after* the PSLRA's 60-day limit on filing such motions.  The Court therefore looks for guidance to a similar case from the Northern District of Ohio.  In that case, *In re Telxon Corp., Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999), the district court considered the propriety of an amended complaint filed after the filing of lead plaintiff motions and explained, "The PSLRA is unequivocal and allows for no exceptions.  All motions for lead plaintiff must be filed within sixty (60) days of the published notice for the first-filed action.  The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed."  *Id.* (emphasis in original).  The court noted that, "if persons seeking appointment as lead plaintiff were allowed to manipulate the size of their financial loss . . . the consequent greater loss asserted would invite additional briefing by the other persons seeking appointment as lead plaintiff, which, in turn, would necessitate responses by the person or group of persons seeking to enlarge their losses."  *Id.*  This result would "effectively render the strict timeliness set forth in the PSLRA meaningless, and would nullify Congress's attempt to expedite the lead plaintiff appointment process."  *Id.*; *see also Singer v. Nicor, Inc.*, No. 02 C 5168, 2002 WL 31356419, at *3 (N.D. Ill. Oct. 17, 2002) (adopting the reasoning of *Telxon* and declining to consider amended allegations of financial loss introduced after the PSLRA's lead plaintiff filing deadline).[12]

---

[12] In a reply memorandum of law filed at 2:01 PM on July 17, 2014 (Doc. 25), Jayhawk attempted, erroneously, to distinguish *Telxon* as a case in which "a movant filed a new complaint with an expanded class period *after* the lead

14

Citing *Telxon*, Ordway and Hong argue that the Court should not consider the Corrected Complaint because that instrument's sole aim is to "manipulate the size" of Jayhawk's financial loss. *Id.* To be sure, whether or not the Rosen Law Firm labels the document it filed on July 3, 2014 a "Corrected Complaint" or an "Amended Complaint," the three paragraphs they added constitute a significant substantive change rather than a simple fix to an "inadvertent scrivener's error." *Compare In re Initial Public Offering Securities Litigation*, 214 F.R.D. 117, 124 n.10 (S.D.N.Y. 2002) ("Plaintiffs' 'Errata to Master Allegations' . . . is comprised of errata in the truest sense of the word. These changes correct spelling errors, add or delete stray words, and otherwise correct inadvertencies, *e.g.*, replacing 'Lehman' with 'Lehman Brothers' throughout."). In light of its significance under *Dura*, the assertion that the truth regarding ChinaCast's financial condition emerged many months earlier than initially alleged cannot be framed as a simple correction to a technical error.[13]

Additionally, other class members could conceivably be prejudiced by consideration of the Corrected Complaint. First, it is possible that—if October 3, 2011 were treated as a partial disclosure date—other class members besides Jayhawk would be able to meet the requirements

---

plaintiff deadline," whereas "here, the complaint was corrected prior [sic] the lead plaintiff deadline." *Id.* at 5-6 (emphasis in original). In recognition of this error, Jayhawk filed a "Corrected" reply memorandum of law on July 17 at 4:55 PM, several hours after filing its initial reply. Doc. 26. Jayhawk did not call the Court's attention to the error contained in the initial reply or explain the purpose of its subsequent filing. However, the later-filed reply omits Jayhawk's assertion that the Corrected Complaint was filed within the PSLRA's sixty-day window and instead attempts to distinguish *Telxon* by stating that the Complaint in this case, unlike that in *Telxon* and other cases cited by Ordway and Hong, "was corrected to address an inadvertent error that was existing at the the [sic] complaint was filed—not for any wrongful purpose." *Id.* at 5.

[13] If the omission of these paragraphs from Topping's Complaint was truly a "scrivener's error," Doc. 14 at 1, or an "inadvertent error," Jayhawk's Corrected Reply Mem. L. (Doc. 26) at 5, that omission would be a curious one, one potentially determinative of the viability of the Firm's arguments on behalf of its other client, Jayhawk. Indeed, the initial Complaint filed by the Rosen Firm alleged, "In early 2012, the Company's shares traded at a price well over $6.00 per share. As the truth emerged regarding the Company's financial condition and Defendants' fraud, the Company's stock price declined dramatically." Compl. ¶ 16. The Corrected Complaint states that the "truth of Defendants' misstatements materialized and/or entered the market through partial corrective disclosures" beginning with the October 3, 2011 letter to ChinaCast shareholders. Corr. Compl. ¶ 16-17.

of a lead plaintiff motion but would be precluded from filing such motions given the expiration

of the PSLRA's time limit for doing so.   Along with other potential plaintiffs, consideration of

the Corrected Complaint also prejudices Ordway and Hong, who filed their motions to serve as

lead plaintiff in reliance on the Complaint as it was filed.   The Court finds the reasoning of

*Telxon* persuasive and, accordingly, will not consider the Corrected Complaint.[14]

Yet even if the Court were inclined to accept the Corrected Complaint, the outcome

would be no different, because ChinaCast's October 3, 2011 statement does not constitute a

partial disclosure.   On that date, ChinaCast simply informed its shareholders by letter that it was

hiring an independent auditing firm to review its cash balances.   Corr. Compl. ¶ 17.   Jayhawk

argues, "[T]he announcement that the Company was to review its cash balances is a partial

disclosure given that the action alleges that Chan was secretly siphoning cash and Company

assets to himself."   Doc. 26 at 3.

Certainly, courts in the Second Circuit have held that "[l]oss caustion 'does not require

full disclosure and can be established by partial disclosure during the class period which causes

the price of shares to decline.'"   *In re Gen. Elec. Sec. Litig.*, No. 09 Civ. 1951 (DC), 2009 WL

2259502, at *4 (S.D.N.Y. July 29, 2009) (quoting *Montoya v. Mamma.com Inc.,* No. 05 Civ.

2313 (HB), 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005)).   However, a "particular

disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow

reveals to the market that a defendant's prior statements were not entirely true or accurate.   That

is, the disclosure must possess a sufficient nexus to a prior misstatement such that it reveals at

---

[14] Moreover, as Ordway observes, to consider Jayhawk's tardily filed "Corrected Complaint" would be "an
invitation to other litigants to 'game the system' by filing successive complaints – regardless how meritless – in
order to maximize their chances of being appointed lead plaintiff," and "evaluating lead plaintiff motions based on
amended complaints filed after the PSLRA's strict 60-day deadline undermines that provision of the statute."   Doc.
19 at 6.

least part of the falsity of that misstatement." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) (citations omitted).  For example, in *In re AOL Time Warner, Inc. Securities Litigation*, the court found purported "partial disclosures" insufficient to establish loss causation, even where they raised some concerns, because they did not "reveal to the market the falsity of . . . prior" audit opinions.  503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007).  Similarly, the court in *Bensley v. FalconStor Software, Inc.*, deemed the revelation that a company's "fourth quarter and full year 2009 financial results would be far below its prior guidance" insufficient to constitute a partial disclosure, because nothing in that announcement suggested that the failure to meet projections was due to fraud, "as opposed to the later announcement which was clearly an exposure of the fraud."   277 F.R.D. at 240.

Likewise, ChinaCast's October 3, 2011 letter to shareholders—"providing an update on its stock buyback program" and explaining that it would hire an independent auditing firm to review its cash balances—did not necessarily shed light on prior misstatements by ChinaCast or reveal the prior occurrence of fraud.  Corr. Compl. ¶¶ 16-18.  "[T]here was nothing in [the letter] that hinted at the fraudulent conduct that ultimately formed the basis of" the instant Complaint.  *Bensley*, 277 F.R.D. at 239.  The announcement included no details that would have informed shareholders about fraudulent activities at the Company.  In fact, it is entirely plausible that many members of the Board remained in the dark about the fraud as of October 2011, in which case they could not have publicized the fraud at that time.  As a district court in the Central District of California found in a separate case related to the precise ChinaCast fraud alleged here —a case in which Jayhawk served as co-lead plaintiff—"[T]here is a total absence of factual allegations that would permit a strong inference that the Individual Defendants[,] [members of the Board] knew about Chan's illegal activities prior to the end of March 2012."  *In*

*reChinaCast Educ. Corp. Sec. Litig.*, No. Civ. 12-4621-JFW PLAX, 2012 WL 6136746, at *6

(C.D. Cal. Dec. 7, 2012) (internal quotation marks and citation omitted).[15]  It was not until

almost five months after the October 2011 letter that the Board announced Chan's removal as

CEO and informed its shareholders that it had discovered "questionable activities and

transactions."  Compl.  ¶ 19.

Accordingly, the October 3, 2011 letter does not constitute a partial disclosure.  *See In re*

*eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006) ("As *Dura* reaffirms, it is

axiomatic that '[a] concealed fact cannot cause a decrease in the value of a stock before the

concealment is made public.'"); *Bensley*, 277 F.R.D. 231 at 240 (noting that, to prove causation,

"there must be more than just a decline in price as a result of a disclosure by the company that

the company is doing poorly; there must be some identification of a disclosure of the *fraud* that

causes a drop in the stock price").  Therefore, even if the Court were to compute Jayhawk's loss

based on the Corrected, rather than the original, Complaint, Jayhawk would be unable to

demonstrate loss causation, having sold all its ChinaCast shares prior to any corrective

disclosure.[16]

---

[15] In that case, Plaintiffs sued the Company and several members of its Board and audit committee.  *ChinaCast Educ. Corp.*, 2012 WL 6136746, at *1.   There, too, "Plaintiffs allege[d] that the truth regarding the fraud began to be revealed on October 3, 2011, when ChinaCast announced that it was suspending its previously-announced stock buyback plan, and disclosed that it was hiring an independent auditing firm . . . to audit its case balances."  *Id.*, at *4.

Jayhawk alleges that Ordway and Hong's citation to the California case "is a red herring," because, in that case, "the court explained that the [October 3 announcement] did not *support scienter*" but nowhere held "that the disclosure of the cash review failed to allege loss causation."  Doc. 26 at 3-4 (emphasis in original).  Although Jayhawk is correct that the California court referenced the October 3 announcement as part of its finding that ChinaCast Board members lacked scienter and were unaware of "problems or issues with ChinaCast's financial reporting" at the time of that announcement, this holding supports Ordway and Hong's argument:  that the October 3 announcement was not intended to, and did not, correct prior misstatements or shed light on specific aspects of the ChinaCast fraud.  *ChinaCast Educ. Corp.*, 2012 WL 6136746, at *1 n. 6.

[16] Although Jayhawk fails in its ability to demonstrate the greatest financial interest, the Court also observes that Jayhawk's status as an in-and-out trader would render it an inappropriate lead plaintiff under the third prong of the PSLRA's evaluation of a potential lead plaintiff:  that it otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  *See Porzio*, 2013 WL 407678, at *3 (noting that, even if in-and-out traders could establish the greatest financial interest, they would be subject to "unique defenses that render [them] incapable of

Based on the forgoing analysis, Ordway has the largest financial interest and is next-in-line as presumptive lead plaintiff if he otherwise satisfies the requirements of Rule 23.

### iii.  Federal Rule of Civil Procedure 23 Requirements

Rule 23 states that a party may serve as a class representative "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a).  At this stage of the litigation, in determining whether a movant is the presumptive lead plaintiff under the PSLRA, only a *prima facie* showing that the requirements of Rule 23 are met is necessary.  *See KIT Digital*, 293 F.R.D. at 445; *Varghese*, 589 F. Supp. 2d at 397.  Furthermore, "[t]ypicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA."  *Oxford Health Plans*, 182 F.R.D. at 49; *see also Simmons*, 2014 WL 1678987, at *4; *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007) ("Further, at this stage of the litigation,

---

adequately representing the class"); *Bensley*, 277 F.R.D. at 240-41 (observing that an in-and-out trader was "subject to unique adequacy and typicality defenses that render[ed] it an inadequate Class representative" and expressing concern that an in-and-out trader might be unable to prove loss causation and therefore found to lack standing, leading to dismissal of the entire case); *Comverse*, 2007 WL 680779, at *5-6 (observing that "the court would be abdicating its responsibility under the PSLRA if it were to ignore . . . [loss causation] at this [pre-discovery] stage," and that "[t]he exclusion of in-and-out shares follows directly from the underlying holding in *Dura*"); *cf. In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147-55 (S.D.N.Y. 2010) (denying "class representative" status to an in-and-out trader, which had sold all of its shares prior to a company's corrective disclosures and thus was "subject to unique defenses" and could not "satisfy Rule 23(a)'s typicality requirement") (citing *Flag*, 574 F.3d at 40).

Beyond the loss causation issue, Ordway identifies two other reasons why Jayhawk, as lead Plaintiff, could not satisfy Rule 23's typicality and adequacy requirements.  First, Ordway argues that Jayhawk lacks standing, because "parties other than the fund itself are the beneficial owners of its purchases," and therefore Jayhawk would subject the Class to unique defenses.  *See* Doc. 19 at 9-12.  Second, Ordway argues that Jayhawk does not satisfy the adequacy requirement because its CFO, Michael D. Schmitz, was employed by Deloitte as a staff accountant prior to joining Jayhawk and is "still a member of two of LinkedIn's 'groups' for employees of the Defendants."  *Id.* at 12.  Because the Court has determined that Jayhawk would be an inappropriate lead plaintiff based on its status as an in-and-out trader and its inability to demonstrate loss causation, the Court need not evaluate these additional arguments regarding Rule 23.

only a preliminary showing of typicality and adequacy is required.").  No party has challenged Ordway's ability to meet Rules 23's typicality and adequacy requirements.

To establish typicality, "the party seeking [class certification or appointment as lead plaintiff] must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Flag*, 574 F.3d at 35 (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).  However, a lead plaintiff's claims need not be identical to the claims of the class in order to satisfy the preliminary showing of typicality.  *Fuwei Films*, 247 F.R.D. at 436 (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 412 (S.D.N.Y. 2004)).  Here, Ordway asserts that he purchased ChinaCast stock during the Class Period and was damaged by the fraudulent activities alleged in the Complaint.  The Court concludes that Ordway's claims and the legal arguments at his disposal are "similar to those of other investors and therefore representative of the putative class."  *Sallustro v. CannaVest Corp.*, No. 14 Civ. 2900 (PGG), 2015 WL 1262253, at *10 (S.D.N.Y. Mar. 19, 2015).  Hence, Ordway has made the preliminary showing of typicality required at this early stage of the proceeding.

Ordway has also made the preliminary showing that he will fairly and adequately protect the interests of the putative class.  The adequacy requirement is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kaplan*, 240 F.R.D. at 94.  Ordway has retained competent and experienced counsel, and has demonstrated substantial losses that suggest he will have a strong interest in advocating on behalf of the Class.  Finally, no other movant has argued that Ordway's claims will be subject to unique

defenses or otherwise rebutted his presumptive status as lead plaintiff.  Accordingly, Ordway is entitled to appointment as lead plaintiff.

### B.  Appointment of Lead Counsel

The PSLRA provides that upon appointing a lead plaintiff, he or she "shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  There is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001)).  Ordway has selected Cohen Milstein as lead counsel.  The firm's resume indicates that it has extensive experience in the field of securities litigation, and that it has successfully prosecuted numerous securities fraud class actions.  Doc. 10, Ex. D.  The Court concludes that Cohen Milstein is qualified to serve as lead counsel for plaintiffs and approves Ordway's selection.

### III.   Conclusion

For the reasons set forth above, Ordway's motion for appointment as lead plaintiff and for Cohen Milstein's appointment as lead counsel is GRANTED, and the motions filed by Jayhawk and Hong are DENIED.  The Clerk of the Court is respectfully directed to terminate the motions (Doc. 5; Doc. 7; Doc. 9).

It is SO ORDERED.

Dated: March 27, 2015
New York, New York

Edgardo Ramos, U.S.D.J.